Good morning. My name is Mark Morell. I represent Oscar Tijerina, the plaintiff appellate. As a personal note, thank you very much for coming up here. I know it's hard to be on the road. I know everybody in this room appreciates we get to stay home and you have to go on the road. You truly are a circuit court. I want to talk about the 45-day rule first. I want to talk about the mistakes that were made by the trial judge in his factual determinations related to the summary judgment. The judge makes a statement that in November 1996, Godfrey Beckett, the supervisor of the plaintiff, denied his promotion or his request for promotion to GS-14. That's, in fact, true. But what they don't say in their facts and what I didn't really make clear was less than 25 days later, Beckett comes to him and says, What's it going to take? So actually how it happened was on the 1st of November 1996, he made a request for 14. Beckett denied it. On the 8th of November or thereabouts, they got together and he said, Okay, that is, Tiarina says, Okay, I want out. I want to go across the river to Ross to the transmission business line and take that job. At least that's a 13 with high public visibility and I'll have a chance to get to a 14. That put Beckett in the squeeze play.  So he came back to him a week later and he said, Okay, what's it going to take? And he says, Let's talk about this. And Tiarina told him, I need that 14. And he said, Okay, that is, Beckett said, Okay, I will support you in your 14. Now this is before 30 days has run on that original denial. So does that negate the denial in your view? Absolutely. When my boss says, I changed my mind. I will support you. That means I'm going to get it. Now he says, I'll go to Curtis and we'll talk. A week later, on about... The case authority you're relying upon for the proposition that if the boss comes to you and wants to talk about the issue, that negates the denial. I'm not relying on a case judge and that's not exactly what I'm maintaining. What I'm maintaining is that Beckett changed his mind and it completely negated that. He said, I will support you. That's what I'm asking you. Is there any case authority that supports that argument? You know, I looked at a dozen different cases in this case and I don't find one exactly on point. I just don't. All of the cases that we looked at and the ones that the judge relied upon, like Rick's, were about absolute terminations. Now, on the 16th of December, 1996, Beckett comes to Tiarina and says, you're going to get it. I've got to talk to Curtis about the timing, but fill the position at Ross so we can get that done because you're not going to Ross. And that was the last statement that was made until November 28th, 2000, when Hickok says, I consider the matter closed. So the district court was wrong about relying on the November 1st declination, declining of the request, because the last word we got just before Christmas of 1996 was, yeah, you're going to get it. Then he goes off and he has this big party. Yay, I got it. They come back in January and then Mr. Beckett starts to waffle. Oh, you must have misunderstood me. Go see Curtis. And then they go through this whole process with Curtis, and they talk about all the different things. Now, the court said. At what point in your view was your client put on notice that he wasn't getting 14? The day the CEO, Steve Hickok, said, I feel the matter is now closed. This is my final decision. The 14 is not appropriate. And within 45 days, Mr. Tiarina had filed for the EEOC. This case is not a series of no, no, no, no, no. It's yeah, maybe, do this, let's do this. And then when they get up into the year 2000 and they do the desk audit, he comes up 25 points shy. 3,605 points is what he needs to get that 14 through a desk audit. He gets 3580. A similarly situated tier three level employee, Leanne Cesario, a white female, comes up 215 points shy, but Curtis gives her the promotion, pursuant to what's called a, what has been termed by Mr. Hickok as a de facto classification system. On the facts of the case, I agree with you that there may be some question, but the problem is whether or not your client was on notice that he had been denied much earlier than you articulate as the date. Well, if we look at the rule, the rule says, it separates things. It says for discrimination situations, it's the time upon which the date upon which it occurred starts ticking. But they say as far as personnel actions, it's the effective date of the order complained of, which makes sense when you figure out. What's the authority for the effective date as opposed to the date of the action? The administrative rule 1614.105, an aggrieved person must initiate contact with the counselor within 45 days of the date of the matter alleged to be discriminatory, or in the case of personnel action, within 45 days of the effective date of the action. What's a personnel action? How is that defined? Is a denial of a promotion a personnel action? I believe it is. Where are you getting that? Because the government has forms, and a personnel action is filled out if there is a termination, a promotion, a transfer, discrete actions that require paperwork. So where are you getting your definition of personnel action that you're using, in this case, for denial of a promotion? From the 29 CFR Chapter 14. Does it not define personnel action? No, it just says that in the case of a personnel action within 45 days. I'm using common sense terms here, and I don't have a definition ready for the court right now, but I would say, okay, if you're the victim of a hostile working environment, when those hostile actions occur, you've got 45 days. Is it a personnel action when Godfrey Beckett says, I support you? Is it a personnel action when he says, you're going to get it? Every statement that's made by a supervisor, in your view, becomes a personnel action. Oh, no, no, no, no, exactly the opposite. How do you draw the line, then? What statements are personnel actions, and which statements are not? How about a denial of a promotion? A denial of a promotion is a personnel action. So 45 days from November 96th. No, because the denial was withdrawn. It wasn't withdrawn, was it? Sure it was. It was on December 16th when he said, you're going to get it. No, he said, I'm going to support you. No, he said that a week before. He said that on December 6th. Then he came back to him just before Christmas. So that fellow had the authority to deny the promotion? Pardon me, I didn't hear. His supervisor had the authority to deny the promotion? His supervisor had the authority to deny the promotion. But didn't have authority to grant it? I think he had the authority to grant it. I'll support you. In other words, if the man had authority to grant it, why would he say, I'll support you? Why didn't he say, you've got it right now? Because according to Beckett's testimony, in his view, he had to work this with Curtis in terms of budgetary priorities. And Veronica Williams' memorandum that we discovered in 2000, written in 95, says we're going to give authority to the supervisors underneath presidents to make these calls on their own without audits. And they were done in lots of cases. As a matter of fact, Beckett did it himself in two cases where he gave 13s and made them 14s. And that's my whole point later on is disparate treatment. We're being treated differently than we're not being given the same treatment as all of the other 24 tier 3 level managers in BPA. He's the only Hispanic and he's the only one that's not a 13. Why isn't that a prima facie case? It's not a 14. Yeah, he's the only one that is a 13. He's the only one that's not a 14. And he's the only one that's Hispanic. And the government's arguing, well, and the judge said, well, he's not tier 3. Well, he certainly is. And they as much admit that. Hickok admits it in his declaration. Smithy admits it in his declaration. And Johansson supports the notion in her declaration in her letter of January 2000. She just says it's not determinative. You may be a 3, but that's not the only thing we're going to say. What we're going to say is that Leanne Cesario was special. She was special and her relationship with Curtis was special. And, therefore, we gave her those extra 215 points. Well, the record is clear that Mr. Tiarina also had a very special case because there was testimony that he came in and basically ran the office for Mr. Beckett. And that Mr. Beckett was in the habit of refusing to allow anything to leave the office in terms of decisions without Tiarina's OK. Suppose that in November 1996, Beckett says to Tiarina, I deny your application for promotion. And Tiarina says, well, that's plainly discriminatory. I'm going to complain about it. Then Tiarina, then Beckett says a week later, well, I'll support it after all. When does the statute begin to run? The statute begins to run in November and then it stops and is eliminated when he says, I will support you. Well, that's that's your theory, then there's a suspension, a tolling of the statute because of the statement that he would. Provided that it supported, provided that it comes within the 30 or the 45 days, absolutely. If it's outside the 45 days, he's toast. Is there any authority for this tolling theory? Well, judge, I'm not. I don't want to I don't want to say that it's a tolling theory because it's not. I'm saying that a mistake can be made. It can be remedied. I can make a wrong decision as a supervisor, but that's all beside the point. You said the statute begins to run when the denial takes place. But when he comes and says, I'll support you. It's suspended, which is, in other words, the same. In other words, it's saying it's told it's canceled. There's no there's no adverse employment decision. I made a mistake. I was wrong. You're going to get it. Well, but you said the act had occurred and it's a discriminatory act. Then you say the statute suspended. I want to know if there's any authority for that proposition. I don't want to I don't I'm not agreeing to use the word suspended. Well, you said it's not OK. Well, then I change it. What I'm saying is what I'm saying is that. If before the termination of 45 days from Beckett's original decision of denial, he comes and says, I changed my mind. I'll support you. You're going to get it. I heard you. That's the argument you made. My question is, was the act the statement you did the promotions denied? Was that a discriminatory act? Yes. OK, so then the statute begins to run. Right. And then when he when he alleviates that by reversing himself. Yes. Then there is no discriminatory act. So there's no longer no ticking. Well, it's already taken place. But, Judge, he can he can change that. He can take it back. It's it's not as if he keyed the guy's car. He says, I made a mistake. And within the 45 days. Don't worry, you'll get the job. Calls him a racially discriminatory name. And a week later, he comes back, says, I take it back. I don't know. No violation? I will admit the possibility that a hostile working environment would have been created by that statement. Yes. Even though he withdraws it. What's that? Even though he withdraws the statement. Well, you know, I think it's different. And I think it's different in the case of a personnel action. I really do. Because a personnel action in this situation is you're not going to get it. OK. You are going to get it. Now, if he says, OK, you are going to get it within 45 days of the initial decision. Isn't that decision completely abrogated? And if there's no longer an adverse employment action upon which to complain? Well, I'm not here to answer any questions. Well, I understand. I probably shouldn't put a question mark on the end of that. Let's talk about a couple of other things here. The judge says he does not allege that he would have been transferred to another position had his request for reclassification been granted. The point that Judge Marsh was making was there's no evidence that he wouldn't have gone to Ross anyway. And, in fact, that's not true. Plaintiff asked CEO Johansson to expedite his request for the upgrade so that if the request for upgrade were granted, he would not have to change his position. So it's clear to me on a variety of grounds that Judge Marsh simply came to some erroneous factual conclusions that the record just boldly proves. I mean, one, you have to take everything he says is true because this is a motion for summary judgment. He gets all benefits of all inferences. So the record, the F-CIRP of record, you must have noticed that a lot of what we put in, they put in. There's very little contention about the fact that this was an ongoing process. Now, do I want to talk about continuing violations? There's two ways to get here, in my view. We either decide that no final decision was made until Hickok made it, and then I'm within the 45-day rule, or you decide that the de facto classification system described by Mr. Hickok, where lower-tier managers can just willy-nilly decide without classification decisions to make guys 13s, 14s, 15s, whatever, as long as they're within their purview, that that, according to my expert, Merv Slobodin, a 35-year classification expert, says is insane. And Slobodin's — Does insanity equal discrimination? Well, I don't know that insane was an exact quote. He uses some pretty salty language. But the discrimination laws are not to examine the correctness or the rationality of employment decisions, as long as they're not discriminatory. Only if they're made in a discriminatory fashion, or applied in a discriminatory fashion. Exactly. And what Mr. Tiarina is saying here is there's a whole underground de facto classification system that exists nowhere else in the federal government except in the BPA, and according to Veronica Williams' memo and Terry Enstadt's memo, they were done because the Office of Personnel Management's decisions or framework didn't allow enough leeway. So they're just going to start doing it. Is that what you regard as your continuing violation theory? Well, actually, the cases say that there's two kinds, that they're either all connected or that there is a systemic, a system that is system-wide. Bundy talked about it. It's talked about in Ricks. If there's a discrete decision that's made, the continuing violation theory does not apply. Right. Actually, it starts a new case for each discrete decision, unless it's a system-wide setup, and all the cases cited by both of us talk about that. Now, I think my strongest argument is that there was no final decision that is an effective decision under the rule until Hickok made his declaration, and that they basically dragged him along through this. There's an equitable argument. They admit in two memos, both CEO Johansson, or the administrator, Judy Johansson, and Steve Hickok, both admit that this guy was misled by his supervisors for years. That's got to count for something. Was he misled about the decision not to give him the promotion? Absolutely. How? He was told by Beckett that he would get it. He was sent to Curtis. Then sent him to Johansson, and each step along the way, they never said no, judge. You won't find any document in here that says you're not going to get this. What they say is, well, you've got to do this, or you've got to do that, or we've got to have an audit done. Well, this guy works in the business. It's like firing your secretary. She knows where the bodies are buried. This guy knows that if he allows certain people to do this desk audit, he's not going to get it. So finally they agree to Stevenson, and Stevenson comes out with it, and there's some discussion about why he's that 25-point shot, and they open it all back up again. Why was he prejudiced by the delay? You said on your equitable theory, why was Therena prejudiced by the delay? Well, he was cajoled into, he was prejudiced by continuing to be, every day he got paid $869 a month less. Well, is that the basis for equitable stuff? No, the equity comes in being misled or tricked or induced by the other side to go along with it, and therefore the other side, through their misleading, is a stop from arguing that I have violated the 45-day rule. Counsel, the fact that your client was sort of an expert in this area, what effect does that have on our analysis of this case? In my view, none. This is not an excusable neglect case. He wasn't unconscious of what was going on. He knew exactly what was going on. He could have filed, he could have sought the counsel with the EEO and still done the same things he was doing, couldn't he? Absolutely, but the downside of that is obvious, and everybody talks about it. Morgan talked about it. They talked about it in, this court talked about it in Fielder versus United Airlines.  I mean, that's what we're basically saying is he got them to go the way he wanted to, and then he worked his way through and he did everything they told him, and he went everywhere that they said. And what point did they ever give him? The case, you know, the Glass case says she doesn't have to give up hope just because of one non-selection. She can go through, and then when she finally realizes it's hopeless, that's when you're supposed to go. We understand your argument, counsel. You've exceeded your time. We'll give you one minute for rebuttal. Thank you. May it please the Court, my name is Herb Sundby. I'm appearing on behalf of the Secretary of Energy and the Vaudeville Power Administration. From the briefs, it's obvious that counsel and I view this case somewhat differently, although I think we do agree on some of the issues. I think the district court, in its opinion, really succinctly stated what the nature of this case is all about. And if I could just quote three sentences. Plaintiff seeks reclassification of a job that he no longer holds. If successful, plaintiff might be able to recover back pay for a three-year period prior to his voluntary acceptance of a transfer to a new position. Plaintiff does not allege that his transfer was anything but voluntary, nor does plaintiff claim that he would not have transferred had his request for reclassification been granted. And I think the place to start is where the Court, some of the questions from the Court alluded to. It's the application of the regulation. It's really one of statutory interpretation and statutory application. And the regulation says what it says. There's really not a lot to argue about that. I could not find in my research a definition, if you will, of a personnel action. It certainly doesn't. It's not contained in the regulation. But clearly, I think, it seems to me it would be indicative of some affirmative action that is taken by an employer. That's the only thing I could think of in terms of how to distinguish between the two. Doesn't the government have forms called personnel action forms? Pardon? Doesn't the government have forms that are called personnel action forms? I think that's right. I know I get them whenever something happens that affects my job. We get a copy of a notification, for example, a coal raise even. We get those kinds of forms. But actually, I think I can give the Court some additional help here, because I think if you want to call the failure to reclassify, if you want to characterize that as a personnel action, it became effective on the date that the reclassification was denied. So in this particular case, quite frankly, whether you look at the date of the act alleged to be discriminatory or the effective date of a personnel action, we're still talking about November of 1996, when Godfrey Beckett initially told Mr. T. Arena, you're not going to get reclassified. Now, that's what Judge Marsh found, and I think his decision was well-reasoned. So how much time does he have from a personnel action? I'm sorry? How much time does he have from a personnel action? It would also be 45 days, according to the regulations. Because you're saying it was effective on the date it was communicated. Yes. And I think that's where the Court, Judge Marsh, focused on Rick's, which I'll talk about in a moment. Because sometimes in personnel actions you can have a promotion or a transfer that's effective in the future, two weeks or a month. Right. Sure, that could be the case. What about your opponent's position that Beckett retreated from that statement, saying that you're not going to get reclassified, and he retreated from that within the 45 days, which gave him hope that the decision was still open? That is a possible argument, but I think in this case it doesn't make any difference because we have such a long time frame that I can address. The EEO counselor wasn't contacted until January of 2001, some four-and-a-half years later. Judge Schwarzer asked if there was a way that the 45-day limitation period can be extended. And there really are three ways. It could be through, and of course counsel argues, the continuing violation doctrine, equitable estoppel, and equitable tolling. I know, Judge Rawlinson, you said on the one case I cited in my brief where the issues of equitable estoppel and equitable tolling were discussed. Our position is the continuing violation doctrine, we now know, because of Morgan and Chorosky and other cases, that it does not apply to discrete employment actions. And it's our position that in this case the denial of a reclassification is a discrete action. So I don't think the plaintiff is saved by the continuing violation doctrine. What about opposing counsel's argument that there was a systematic underground way of doing the promotions that sort of was a continuing violation of individuals' rights and a discriminatory policy that fed that underground system? My answer to that is that I think that answer was that issue was decided in Chorosky citing Lyons, which citing Morgan. That even though we might have an allegation of a pattern or practice, it doesn't save the discrete employment actions. You have to exhaust your remedies at the time those are made. Now, there's a claim here that equitable estoppel, excuse me, tolling should apply. But he didn't want to use the word tolling. Suspension. There's actually two concepts, equitable tolling and equitable estoppel. In the Johnson v. Henderson case, the court points out that equitable tolling has to do with the situation where an individual employee or claimant is not aware of their rights. And as I pointed out in my brief, this man, Mr. Terena, was sophisticated. He knew exactly what his rights were because that was his job. I mean, he was very knowledgeable about employment requirements. So he knew what these deadlines were. Now, there's also a statement made in counsel's brief that maybe equitable estoppel should apply because somehow Mr. Terena was misled as to what was going to happen in the future. And this gets back to Judge Nelson's comment that, well, he was told later on, well, I've changed my mind. I will try to support you. And the argument then is, okay, what does that do with the running of the statute? That was actually addressed by the district court in this case. And the district court pointed out that it still doesn't save this case because any assurances, any claims that somehow Mr. Terena was misled into sitting on his rights, all that ended in August of 1999. At that point in time, Mr. Terena gave up and took a voluntary transfer to another job. So the argument that somehow he was misled along the way into kind of resting on his rights, if you will, that truly ended at that point in time. So your argument is that if an employer misleads an employee and the employee transfers, at that point the employee has to trigger his or her rights or lose them? Yes. I think that would be an alternate date to what Judge Marsh found was in November. We can extend it out for purposes of this case even to August of 1999. At that point, an argument could be made that the 45-day period begins to run, but it still doesn't save Mr. Terena's case because he waited another couple of years before he actually contacted an EEO counselor. So clearly at that point in time, I think that's about as far out as you can go. Now, counsel has made the argument in his brief that, well, there was this continual discussion back and forth. The Court has a rather large excerpt of record. There were e-mails and memos and discussions, contentions and arguments and counterarguments. My position is in this case it didn't change anything. Did his transfer preclude the 14 being awarded to him? Yes, because he took a job that was a 13. But he had a job that was a 13 and he could still get a 14, so why would transfer to a different 13 job preclude getting a 14? I don't understand that. Well, he has a new job now, so he can't go back. He took a voluntary transfer. He took another job that was rated as a GS-13. There's no dispute about that. If his old job was reclassified as a 14, he could compete for that, couldn't he? He could compete, certainly. So it's not like he had absolutely no hope of getting the 14 because he transferred. Well, that's true, I suppose. But, again, he should have if that's what he wanted to do. He couldn't just sit back and wait for another couple of years. He had to pursue his administrative remedies, and he didn't do that in this case. Well, I'm just speaking to your argument that that cut off any possibility of him getting the 14. I don't think that's accurate. Well, he could have reapplied. Sure, sure, that's true. But it was made clear to him, and I think it's cited in the brief. I don't recall what page on my brief. But it was made very clear to Mr. Tiarena sometime prior to his transfer that there wasn't going to be a GS-14 spot for him or anybody else, for that matter, in his old division. So I think that's why he transferred. We have to assume that. And he was told, even after that, when he was in January, actually in the summer of 1999, about the time that he took the voluntary transfer, he was sending his complaints to the administrator of BPA, top person, the very top. She finally responded, and I have this referenced in my brief, in January of 2000. And her response, it's a memo, says, final response. She addresses Mr. Tiarena's situation, says she's sorry about the misunderstandings, and she hopes he's happy in his new job. I'm kind of paraphrasing here. So, again, you could even go out that far and say, okay, this is the final response from the administrator, and even if the 45 days were to start running from that date, it's still not timely. The only way that Mr. Tiarena saves this case is he has to extend the limitations period up to something that occurred within 45 days of the date that he contacted the EEO counselor in January of 2001. So it's our position that he's not saved by any of the tolling principles. On your statement about what happened in August of 99. I'm sorry, I have a bit of a cold. Your statement about his transfer in August of 99, at least at that point, triggered the 45 days, I guess, was the thrust of your argument. On the hypothetical of whether his old job could have been reclassified to a 14 and he could have reapplied, if he had been denied, that would have been a new personnel action, would it not? Yes, it could have, sure. So he would have to use the 45 days from that denial? Sure, if he applied for a reclassified position, if, in fact, that happened, although under this record, everybody who looked at this job said it's not a GS-14, it's properly classified as a 13, but certainly if he wanted to reapply for that job and if he felt that he was denied that position and he felt that it was discriminatory or retaliatory, for that matter, then obviously he could then pursue his remedies. But, again, the 14 days starts to run. 45 days. 45 days, I'm sorry. Sorry about that. Again, I think that the district court's opinion was pretty well reasoned, and I think if you accept the application of Ricks in terms of when the actual adverse employment action, if you will, occurred, whether it be November or as late as even the summer of 1999, when at that point any assurances that had been given Mr. T. Arena were over, he knew it wasn't going to happen, and that's why he transferred. In fact, he initially, clear back when he first requested the reclassification in November of 1996, it was denied that month, and he asked Dr. Beckett to transfer him, to let him get out of there. So even at that point, he was prepared to go on to another job. That's a legal matter. I'm not sure that there's any case authority that says a request for a transfer imputes knowledge of denial of request. That's what you're asking us to hold. Well, I think that's right. Do you have any case authority to support that argument? I don't. I didn't put this in the brief, but I was thinking about this. It almost seems to me like when Mr. T. Arena requested the transfer and transferred in the summer of 1999, it's almost analogous to a constructive discharge case where a person says, look, I'm not getting anywhere. Obviously, it's a little different here because he wasn't claiming that his working conditions were intolerable, but at that point, he had a duty that he knew about to pursue any claim of discrimination that he thought he had. And if Mr. Morrell's position is, well, he didn't really know that he had a discrimination claim until much, much later, as Judge Marsh found, there was nothing that Mr. T. Arena discovered between the summer of 1999 and when he finally contacted the EEO counselor that would have alerted him to the fact that maybe he was, in fact, the victim of discrimination. Nothing at all. It's not like some of the cases that have extended in the statute of limitations period have held well. I don't recall the name of the case, but the employee found basically the smoking gun. It was a pretty damaging document, and she then pursued her administrative remedies. In this panel, this court held that that was okay, but that's not the case here. And clearly, as late as June, excuse me, January of 2000, when Mr. T. Arena was communicating with the administrator of BPA, he alerted her to the fact that he might be thinking about filing a disparate impact discrimination claim. It's referenced in my brief. It's in the excerpt of the record. He even outlined the kind of claim that he was thinking about, so he clearly, at least at that point, was thinking, well, maybe I have a claim here of disparate impact based upon this de facto classification system. So he's thinking about that, and it's still a year before he even contacts an EEO counselor. So throughout this whole process, there are many, many points where he should have been aware that he needed to exhaust his administrative remedies. So unless the court has any further questions. It appears not. Thank you, counsel. Okay, thank you. I just have two points in rebuttal. On January 3rd, 2000, Johansson issued the response to T. Arena. She leaves the opportunity open for T. Arena to return to the EEO office, and if a classification review says you get a 14, you get a 14. The classification review agreed to between the parties didn't take place until the following spring or summer, 7-20-00. So Johansson says, look, I don't perceive any disagreements with the chronology of events. Internal audit is better. Well, as it turns out, there's two GS-14 tier three level managers in internal audit. And then she says, and by the way, if you go get your classification review from Stevenson, and it turns out okay, you can have the deal. Isn't the door still open? Now, that's six months before the audit is even conducted. Now, Mr. Sundby says that the judge said everyone asked to review plaintiff's classification determined that it was correctly set at a 13. False. Look at Hickok's declaration, page one, paragraph two. Stevenson even acknowledged, the auditor even acknowledged that this was pretty much across the board, this de facto classification system, and it was clear that Oscar's concern with the audit that was done in about three or four months before he makes his, or no, five months before he makes his claim, they were still fighting about it. And they were still talking about this ability of any manager to just say, give it to him. Are my times up? Your time is up. Thank you. Thank you to both counsel. The case just argued is submitted for a decision by the court. The final case on calendar for argument is Ki vs. Beebe. I'm sure I butchered that name. Thank you. While you all are preparing for argument, do the defendants plan to share their time?
judges: T.G. Nelson, Rawlinson, Pollak